## UNITED STATES DISTRICT COURT
## FOR PUERTO RICO

| | |
|---|---|
| **COMMONWEALTH OF PUERTO RICO** through the **DEPARTMENT OF NATURAL AND ENVIRONMENTAL RESOURCES,**<br><br>                    **Plaintiff,**<br><br>v.<br><br>**3M COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER FIRE & SECURITY AMERICAS CORPORATION; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; EIDP, INC., F/K/A E.I. DU PONT DE NEMOURS AND COMPANY; KIDDE PLC, INC.; NATIONAL FOAM, INC.; THE CHEMOURS COMPANY; TYCO FIRE PRODUCTS LP; and ABC CORPORATIONS (NAMES FICTITIOUS),**<br><br>                    **Defendants.** | **CIVIL CASE NO.**<br><br>    **23-cv-01281**<br><br><br>**COMPLAINT WITH JURY DEMAND** |

## COMPLAINT

Plaintiff, the Commonwealth of Puerto Rico through its Department of Natural and Environmental Resources ("DNER"), an agency created by virtue of Act No. 23-1972 responsible for implementing the public policy of the Government of Puerto Rico contained in section 19 of

Article VI of the Constitution of the Commonwealth of Puerto Rico and the Environmental Public Policy Act, Act No. 416-2004, as amended, including *inter alia,* to manage, control, hold in trust, and own and administer the water resources and other natural resources within its boundaries on behalf of the public as trustee over the Commonwealth's water resources and quasi-sovereign interests (hereinafter referred to as "the Commonwealth" or "Plaintiff"), by and through its undersigned counsel, brings this civil action against the Defendants identified below, on behalf of itself and as *parens patriae,* and alleges as follows:

## INTRODUCTION

1.      Plaintiff brings this action against Defendants to address contamination of Puerto Rico's natural resources with toxic per- and polyfluoroalkyl substances ("PFAS"), including but not limited to perfluorooctane sulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"), perfluorononanoic acid ("PFNA"), perfluorohexane sulfonic acid ("PFHxS"), perfluorobutane sulfonic acid ("PFBS"), and hexafluoropropylene oxide dimer acid ("HFPO-DA" a/k/a "GenX").[1]

2.      Defendants are responsible for this PFAS contamination threatening Puerto Rico's natural resources and citizens. They designed, manufactured, marketed, distributed, and sold a wide range of products that contain PFAS ("PFAS Products"), the use, disposal, and discharge of which in Puerto Rico released PFAS into the environment through multiple pathways, contaminating natural resources and putting Puerto Rican's health at significant risk.

3.      Defendants' various PFAS Products included, but were not limited to: specialized fire-fighting foams, known as aqueous film-forming foams ("AFFF"), used to extinguish or

---

[1] Plaintiff reserves the right to seek relief related to additional specific PFAS found to have contaminated Puerto Rico's natural resources, based on further development of the scientific community's understanding of the risks posed by these chemicals in drinking water and other environmental media. As explained further below, the specific PFAS that are the subject of this Complaint are those included in the United States Environmental Protection Agency's recently proposed national drinking water regulations.

suppress flammable liquid fires; household and consumer products such as grease-, stain-, and water-repellant cookware, carpeting, clothing, and food packaging; and processing aids used to make further products. Defendants generated significant profits from selling these products, including under branded names like Teflon and Scotchgard.

4.     To ensure they continued to profit enormously from their sale of PFAS Products, Defendants concealed their knowledge that PFAS are toxic and pose significant risks to human health and the environment. Internally, Defendants determined that PFAS are harmful and began accumulating in human blood throughout the country decades ago.

5.     They further knew that PFAS released and/or discharged into the environment would reach the Commonwealth's waters and drinking water supplies, and buildup in people's bodies as they were continuously exposed to the chemicals over time. They also knew that PFAS, now commonly known as "forever chemicals," are persistent and will remain in the environment for hundreds or even thousands of years, leaving a toxic legacy for future generations of Puerto Ricans and others.

6.     Nevertheless, Defendants chose not to warn Plaintiff and the public of the dangers posed by their PFAS Products, and instead hid these dangers to protect their corporate image and limit their liability.

7.     Because of Defendants' decades of concealment of the risks of PFAS Products and public assurances that their PFAS Products were safe, regulators, the scientific community, and the general public are only beginning to understand the threat posed by these chemicals. Based on recent developments, including the United States Environmental Protection Agency's ("USEPA") proposed drinking water regulations for PFAS, the Commonwealth is only now in a position to understand the risks posed by PFAS, and by extension, the immense efforts that will be required

to remove these chemicals from Puerto Rico's environment and protect the People of Puerto Rico from further exposure.

8.      Recently, in March 2023, USEPA released its proposed drinking water standards for PFOS, PFOA, PFNA, PFHxS, PFBS, and GenX. *See* PFAS: PFOA and PFOS National Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (Mar. 29, 2023). USEPA provided notice that the maximum contaminant levels (the allowable concentration of a contaminant in drinking water) for PFOS and PFOA would be extraordinarily low, at 4 parts per trillion ("ppt"). USEPA further provided notice that it would regulate the combination of PFNA, PFHxS, PFBS, and GenX in drinking water through an approach known as a Hazard Index. As a result of these proposed regulations, Puerto Rico's public water suppliers will be required to meet these stringent requirements by constructing and/or updating treatment systems and taking other action in the near future to protect the health of the people of Puerto Rico from this emerging threat.

9.      Based on USEPA's proposed drinking water standards for these PFAS, it is now apparent that addressing the threat to human health and the environment that Defendants have caused will require substantial resources and expense. The Commonwealth will be faced with the enormous challenge of investigating, monitoring, treating, remediating, removing, and disposing of these toxic chemicals from Puerto Rico's waters and other natural resources and continuing to maintain and monitor into the future for an indeterminate amount of time.

10.     As PFAS sampling for PFAS in Puerto Rico occurs, contamination will be discovered in sites and areas across the Island.

11.     To date, PFAS sampling in Puerto Rico has been sporadic, conducted mostly by federal agencies, and focused on military bases because AFFF is and historically has been used at these types of facilities. PFAS contamination has been found at Naval Station Roosevelt Roads,

Muniz Air National Guard Base, and Fort Buchanan; and is believed to have migrated to surrounding areas, polluting groundwater, surface water, and additional resources in the surrounding areas.

12.     Additional sites and areas impacted by PFAS contamination will be uncovered in the future, and must be addressed. Defendants, not the Commonwealth or its citizens, are responsible for this contamination and must pay for the costs and damages related to removing these toxic chemicals from, and damages to, the environment.

13.     Plaintiff, the Commonwealth of Puerto Rico through the Department of Natural and Environmental Resources, brings this case in its trustee, *parens patriae*, and regulatory capacities, as well as owner, to address PFAS contamination caused by Defendants' PFAS Products.

14.     The DNER  manages, controls, holds in trust, and is the custodian for, the natural resources within  the Commonwealth for the people of Puerto Rico. The Commonwealth, through the DNER, has standing to enforce both federal and the Commonwealth's environmental statutes and regulations through The Public Policy Environmental Act, Title II, Act No. 9, 12 L.P.R.A §§ 8001 *et seq.* as well as the Act for the Conservation, Development and Use of the Water Resources of Puerto Rico 12 LPRA §1115 *et seq.*.

15.     In its capacities as both trustee and *parens patriae*, the Commonwealth has the authority and obligation to protect this public trust and seek compensation for injury to its natural resources. *See* 12 L.P.R.A § 8002c(a)(1) (charging the DNER to, *inter alia*, "bring civil or administrative action against any person . . . for the removal, correction or termination of any adverse effect on the quality of the environment as a result of unauthorized pollutants being discharged, whether accidentally or not").

16.     The DNER is also entrusted with the protection and development of natural resources. *See* 3 L.P.R.A. § 153; 12 L.P.R.A § 8002 *et seq.*. As such, the DNER may "take all proper measures to prevent any harm to the environment and the natural resources[,]" including by "[r]esorting to the courts of Puerto Rico or the United States of America, represented by the Secretary of Justice, the attorneys of the [DNER] or a private attorney contracted for such purpose, in order to request the enforcement of any resolution or decision issued by the [DNER] requiring immediate action to respond to an environmental emergency, and any remedy requested by the [DNER], through any civil action." *Id.* § 8002c(a)(12),(b)(1)(I).

### Defendants

17.     At all relevant times, Defendants designed, manufactured, marketed, promoted, distributed, sold, and/or assumed or acquired liabilities related to PFAS Products.

18.     Defendant 3M Company ("3M") is a Delaware corporation . Its principal place of business is 3M Center, St. Paul, Minnesota 55144-1000. 3M has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products used in Puerto Rico. On information and belief, 3M voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

19.     Defendant AGC Chemicals Americas, Inc. ("AGC Chemicals") is a Delaware corporation. Its principal place of business is 5 East Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. AGC Chemicals is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass Co., Ltd.). AGC Chemicals and/or its affiliates have designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, AGC Chemicals voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

20.     Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 2900 Highway 280 S, Suite 300, Birmingham, Alabama 35223. Amerex and/or its affiliates have designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, Amerex voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

21.     Defendant Archroma U.S., Inc. ("Archroma") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 5435 77 Center Drive, Suite 10, Charlotte, North Carolina 28217. Archroma, a subsidiary of Archroma Management, LLC, designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, Archroma is a successor to Clariant, which manufactured fluorochemicals used in AFFF and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc. On information and belief, Archroma voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

22.     Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business located at 900 First Avenue, King of Prussia, Pennsylvania 19406. Arkema is a successor in interest to Atochem North America Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. Arkema and/or its predecessors have designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, Arkema voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

23.    Defendant BASF Corporation ("BASF") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932. On information and belief, BASF is the successor in interest to Ciba Inc. (f/k/a/ Ciba Specialty Chemicals Corporation). On information and belief, Ciba has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, BASF voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

24.    Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, Buckeye voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

25.    Defendant Carrier Fire & Security Americas Corporation ("Carrier Fire") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Fire is the indirect parent of Kidde-Fenwal, Inc.,[2] which is the successor in interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc., f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). Carrier Fire is also the successor in interest to UTC Fire & Security Americas Corporation, Inc., following the spinoff transaction described in Paragraph 26 below. Carrier Fire, through Kidde/Kidde Fire, has designed, manufactured, marketed, promoted, distributed, and/or

---

[2] On May 14, 2023, Kidde-Fenwal, Inc. filed for bankruptcy in the case captioned *In re Kidde-Fenwal, Inc.*, Case No. 23-10638-LSS (D. Del. Bankr.). In light of the automatic stay of claims against Kidde-Fenwal, Inc. pursuant to 11 U.S.C. § 362, Kidde-Fenwal, Inc. is not named as a defendant herein.

sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, Carrier Fire voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

26.     Defendant Carrier Global Corporation ("Carrier") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. On or around April 3, 2020, United Technologies Corporation completed the spinoff of one of its reportable segments into Carrier, a separate publicly traded company. Pursuant to the Separation and Distribution Agreement By and Among United Technologies Corporation, Carrier Global Corporation, and Otis Worldwide Corporation, Carrier assumed certain liabilities, including those related to the business operated by Kidde/Kidde Fire Fighting. Carrier's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security. Carrier's Fire & Security products and services are sold under brand names that include Chubb and Kidde. At all relevant times, Carrier conducted business throughout the United States, including in the Commonwealth. Carrier, through Kidde/Kidde Fire, designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, Carrier voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

27.     Defendant ChemDesign Products, Inc. ("ChemDesign") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at Two Stanton Street, Marinette, Wisconsin 54143. On information and belief, ChemDesign has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, ChemDesign voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

28.     Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542. Chemguard has designed, manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFAS that was used in the Commonwealth. Furthermore, Chemguard has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico, and has also designed, manufactured, marketed, and/or sold fluorosurfactants containing PFAS used to manufacture PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, Chemguard voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

29.     Defendant Clariant Corporation ("Clariant") is a New York corporation. Its principal place of business located at 500 East Morehead Street, Suite 400, Charlotte, North Carolina 28202. Clariant has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. Clariant is a predecessor to Archroma and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc. On information and belief, Clariant voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

30.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation. Its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2019, New DuPont spun off a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont liabilities—including those relating to PFAS. On information and belief, Corteva voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

10

31.     Defendant DuPont de Nemours, Inc. ("New DuPont"), f/k/a DowDuPont Inc., is a Delaware. Its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2015, after EIDP, Inc. ("Old DuPont"), f/k/a E. I. du Pont de Nemours and Company spun off Chemours, Old DuPont merged with The Dow Chemical Company ("Old Dow") and transferred Old DuPont's historic liabilities and assets to other entities, including New DuPont. In connection with these transfers, New DuPont assumed certain Old DuPont liabilities—including those relating to PFAS. On information and belief, New DuPont voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products

32.     Defendant Dynax Corporation ("Dynax") is a Delaware corporation. Its principal place of business is 79 Westchester Avenue, Pound Ridge, New York 10576. Dynax has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, Dynax voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products

33.     Defendant Old DuPont, f/k/a E. I. du Pont de Nemours and Company, is a Delaware corporation. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, Old DuPont voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products

34.     Defendant Kidde PLC, Inc. ("Kidde PLC") is a Delaware corporation. Its principal place of business is Nine Farm Springs Road, Farmington, Connecticut 06032. Kidde PLC was part of United Technologies Corporation. At all relevant times, Kidde PLC conducted business throughout the United States, including in the Commonwealth. Kidde PLC, through Kidde/Kidde Fire, designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products,

including products incorporated into AFFF, used in Puerto Rico. On information and belief, Kidde PLC voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products

35.     Defendant National Foam, Inc. ("National Foam") is a Delaware corporation Its principal place of business is 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures the Angus brand of products and is the successor in interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). National Foam/Angus Fire has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, National Foam voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

36.     Defendant The Chemours Company ("Chemours") is a Delaware corporation. Its principal place of business is 1007 Market Street, Wilmington, Delaware 19899. In 2015, Old DuPont spun off its performance chemicals business to Chemours, along with vast environmental liabilities. Chemours has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, Chemours voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

37.     Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership. Its principal place of business is One Stanton Street, Marinette, Wisconsin 54143-2542. Tyco manufactures the Ansul brand of products and is the successor in interest to Ansul Company (together, "Tyco/Ansul"). Tyco/Ansul has designed, manufactured, marketed, promoted, distributed, and/or sold PFAS Products, including products incorporated into AFFF, used in Puerto Rico. On information and belief, Tyco voluntarily targeted Puerto Rico for the distribution and sale of its PFAS products.

38.     Defendants ABC Corporations 1 through 25, unknown at this time, are designers, manufacturers, marketers, promoters, distributers, sellers, and/or have assumed or acquired liabilities, or attempted to improperly insulate themselves from the liabilities, related to PFAS Products that have harmed the Commonwealth's natural resources, property, or citizens, or that otherwise share responsibility for such injuries. The true names and identities of ABC Corporations 1 through 25 are not known to Plaintiff at this time. When these ABC Corporations are identified, they will be added by name.

## JURISDICTION AND VENUE

39.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1331 and 28 U.S.C. § 1367.

40.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1395(a).

## FACTUAL ALLEGATIONS

### A.  PFAS Endangers Puerto Rico's Environment and People.

41.     PFAS are man-made compounds that do not exist in nature, specifically engineered by certain Defendants to include repeating carbon chains containing carbon atoms on which all available bonds are occupied by fluorine atoms, a chemical bond that does not normally exist. The resulting carbon-fluorine bond is one of the strongest in chemistry. It imparts to PFAS their unique, but at the same time harmful, chemical properties.

42.     Based on their chemistry, PFAS chemicals cause extensive and long-lasting environmental contamination.

43.     Once introduced into the environment, PFAS spread because they easily dissolve in water. They also remain in the environment indefinitely because of their multiple carbon-

fluorine bonds, which are exceptionally strong and stable, and resist metabolic and environmental degradation processes.

44.     Removal of PFAS from water, including drinking water sources, requires specialized, and expensive, water treatment systems.

45.     In short, once PFAS are released, they migrate through the environment, resist natural degradation, contaminate groundwater and drinking water, and are difficult and costly to remove.

46.     PFAS also bioccumulate in the bodies of animals and are toxic to their health. Because certain PFAS are excreted from individual organisms only slowly, ongoing low-level exposure results in a buildup of PFAS. Thus, PFAS can also biomagnify, meaning that their concentration in organic tissue increases, as they are consumed up the food chain.

47.     PFAS are toxic to humans and can cause significant adverse effects. The presence of these chemicals in drinking water and the environment thus presents a significant and imminent threat to public health and the environment.

48.     According to USEPA, human exposure to PFAS may lead to: "Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women; developmental effects or delays in children including low birth weight, accelerated puberty, bone variations, or behavioral changes; increased risk of some cancers, including prostate, kidney, and testicular cancers; reduced ability of the body's immune system to fight infections, including reduced vaccine response; interference with the body's natural hormones; [and] increased cholesterol levels and/or risk of obesity."  Environmental Protection Agency, *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited May 30, 2023).

49.     USEPA's most recent analysis demonstrates even extremely low doses of PFAS can result in adverse health effects for humans, and that this risk must be addressed.

50.     In March 2023, USEPA proposed establishing maximum contaminant levels for PFOS and PFOA at the lowest amount that be reliably measured today (4 ppt) based on available technology.

51.     PFAS can enter the environment in multiple ways, compounding the problem Plaintiff faces now and into the future.

52.     PFAS are the active ingredient in AFFF. AFFF is used to extinguish and/or prevent flammable liquid fires, including jet-fuel, aviation-related, hangar, ship, chemical, and other types of liquid fires. It has also been used to train firefighters and to test firefighting equipment.

53.     When used during a firefighting event or training exercise, AFFF can cause hundreds, if not thousands, of gallons of foamy water laced with PFAS to enter the environment, including but not limited to, through soils, groundwater, sediment, and surface water.

54.     PFAS also enter the environment from industrial facilities that manufacture or use PFAS. Industries understood to be sources of PFAS include, among others, textile and leather processing, paper mills, metal finishers, wire manufacturers, plating facilities, and manufacturers and facilities using fluorosurfactants, resins, molds, plastics, photolithography, and semiconductors. PFAS are released from these facilities to land, in water, and through air emissions.

55.     PFAS further enter the environment through the normal use and disposal of PFAS Products. Landfills receive household and consumer products, industrial wastes, sewage sludge, and construction and demolition debris, all of which can contain PFAS. PFAS in all landfills, active and closed, can leach from these wastes into groundwater and surface water.

56.     Municipal and industrial wastewater treatment plants are also repositories for industrial and consumer waste containing PFAS. These facilities provide multiple pathways for PFAS to contaminate groundwater and surface water, including by point source discharges of effluent, leakage or unintended releases from sewerage or surface impoundments, air emissions, and disposal of biosolids or other byproducts generated during the treatment process. This results in further discharges of PFAS to water and introduces PFAS into biosolids used in agriculture and various other purposes.

57.     PFAS from Defendants' PFAS Products that contaminates Puerto Rico's environment will remain there and continue to contaminate such resources, unless and until they are treated, removed, or otherwise cleaned up.

**B.  Defendants' History Manufacturing and Selling PFAS Products**

*3M*

58.     Defendants sold a wide variety of PFAS Products in Puerto Rico and throughout the United States.

59.     Starting in the 1940s and through the early 2000s, 3M was the primary manufacturer of PFAS in the United States.

60.     Further, 3M was the only manufacturer of PFOS.

61.     Beginning in the 1940s, 3M manufactured PFOS and PFOA through a process known as electrochemical fluorination. Electrochemical fluorination produces a "branched" form of the chemicals that distinguishes them from PFAS produced through other processes later on.

62.     3M manufactured, marketed, distributed, and sold PFAS Products that included textile treatments, food packaging, fluorosurfactants, and additives. Among those products were those branded under the names Scotchgard®, Stainmaster®, Hush Puppies® which was marketed

as providing stain-resistant properties. 3M also supplied PFAS to third parties to use in their own products.

63.     3M manufactured, marketed, distributed, and sold AFFF from the 1960s to the early 2000s. It was the largest manufacturer of AFFF (predominantly Light Water® brand) and the only manufacturer of PFOS.

64.     In 2000, 3M announced it was phasing out its manufacture of its PFAS Products, including AFFF. In its press release announcing the phase-out, 3M stated "our products are safe." 3M further stated that "the presence of these materials at . . . very low levels does not pose a human health or environmental risk." 3M made no mention in its press releases or regulatory statements of the risks to human health and the environment posed by the chemicals, although those risks were known to it at the time.

***Old DuPont***

65.     Old DuPont was also a significant user and manufacturer of PFAS. Beginning in the early 1950s, Old DuPont purchased PFOA from 3M so that it could produce and sell various products, including polytetrafluoroethylene ("PTFE"), a fluoropolymer that DuPont marketed under the brand name Teflon®.

66.     DuPont's use of PFOA expanded over time such that the company utilized it to make a growing number of products employed used across wide sectors of consumer and industrial applications, including food packaging, carpeting, clothing, upholstery, and paints, as well as treatment and cleaning products.

67.     When 3M ceased manufacturing PFOA in the early 2000s, and DuPont no longer had a supplier for PFOA, DuPont chose to begin manufacturing PFOA itself in the early to mid-2000s.

68.     DuPont manufactured PFOA using a telomerization process, which produces a linear form of PFOA, as opposed to the branched form of PFOA previously manufactured by 3M.

69.     DuPont also manufactured fluorosurfactants for AFFF.

***Manufacturers of AFFF containing PFAS***

70.     The remaining Defendants manufactured, marketed, and sold AFFF, or the PFAS-containing fluorochemicals or fluorosurfactants used to make AFFF.

71.     By at least the early 1970s, National Foam began to manufacture, market, and sell AFFF.

72.     By at least the 1970s, Tyco/Ansul began to manufacture, market, and sell AFFF.

73.     By at least the 1990s, Angus Fire and Chemguard began to manufacture, market, and sell AFFF.

74.     By at least the 2000s, Buckeye began to manufacture, market, and sell AFFF.

75.     By at least the 1970s, Arkema's predecessors and Ciba Corporation ("Ciba") supplied fluorosurfactants for AFFF.

76.     Old DuPont acquired Arkema's predecessors' fluorosurfactants business in 2002, after which it supplied fluorosurfactants for AFFF. Later on, after Chemours's spinoff from Old DuPont, Chemours continued to supply fluorosurfactants for AFFF.

77.     Chemguard acquired Ciba's fluorosurfactants business in 2003, after which it took on the supply of fluorosurfactants for AFFF.

78.     By at least the 1990s, Dynax supplied fluorosurfactants for AFFF.

79.     At varying times, AGC Chemicals and Clariant supplied the fluorochemicals used to make AFFF.

80. Between 2007 and 2013, Kidde owned and operated National Foam's PFAS business.

81. After 3M exited the AFFF market, other Defendants continued to manufacture and sell AFFF and its components that contained PFAS. Indeed, Old DuPont saw an opportunity to obtain a share of the AFFF market when 3M exited, even though Old DuPont had decades of evidence that PFAS were highly toxic and dangerous in the environment.

82. The other Defendants' AFFF containing PFAS were created using a telomerization process, which makes it difficult to chemically trace the PFOA as being manufactured, distributed, or sold by a particular Defendant.

**1. 3M Knew, or Should Have Known, of the Harm Caused by PFAS, and 3M attempted to Suppress Negative Information About These Chemicals.**

83. 3M has known for decades that the PFAS are toxic and adversely affect the environment and human health.

84. By 1956, studies showed that 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

85. 3M knew as early as 1960 that its PFAS waste could leach into groundwater and otherwise enter the environment. An internal 3M memorandum from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

86. As early as 1963, 3M knew that its PFAS products were highly stable in the environment and did not degrade after disposal.

87. By no later than 1970, 3M was aware that its PFAS products were hazardous to marine life. Around this time, 3M abandoned a study of its fluorochemicals after the company's release of the chemicals during the study caused severe pollution of nearby surface waters.

88.     By the 1970s, 3M had become concerned about the risks posed to the general population by exposure to 3M's fluorochemicals.

89.     In 1975, 3M found there was a "universal presence" of PFAS (PFOA and/or PFOS) in blood serum samples taken from across the United States. Since PFAS are not naturally occurring, this finding reasonably alerted 3M to the high likelihood that its products were a source of this PFAS-a scenario 3M discussed internally but did not share outside the company. This finding also alerted 3M to the likelihood that PFAS are mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFAS in human blood.

90.     As early as 1976, 3M began monitoring for the presence of PFAS within the blood of its employees because the company was concerned about the health effects of PFAS.

91.     In 1978, 3M conducted PFOS and PFOA studies in monkeys and rats. All monkeys died within the first few days or weeks after being given food contaminated with PFOS. The studies also showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species tested.

92.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama, plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River adjacent to the 3M plant.

93.     According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, 3M continued its resistance.

94.     In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

95.     In 1984, 3M's internal analyses demonstrated that fluorochemicals were likely bioaccumulating in 3M's employees.

96.     Despite its understanding of the hazards associated with the PFAS in its products, 3M actively sought to suppress scientific research on the hazards associated with them and mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, and effects to human health and the ecological risks of PFAS.

97.     At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations," those articles "can be a large obstacle to refute."

98.     3M used a variety of tactics to deceive others and to hide the negative effects of PFAS. For example, in 1999, Dr. Rich Purdy, a former environmental specialist with 3M, wrote a letter detailing, among other things (i) 3M's tactics to prevent research into the adverse effects of its PFOS, (ii) 3M's submission of misinformation about its PFOS to EPA, (iii) 3M's failure to disclose substantial risks associated with its PFOS to EPA, (iv) 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population, (v) 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain, and (vi) 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

99.     Dr. Purdy described PFOS as "the most insidious pollutant since PCB [polychlorinated biphenyl]. It is probably more damaging than PCB because it does not degrade,

whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB."

100.     Despite its knowledge of the risks associated with exposures to its PFAS Products, when 3M announced it would phase out its in 2000, it falsely asserted "our products are safe," instead of disclosing what it knew about the substantial threat posed by PFOS and PFOA.

101.     3M knew, or should have known, that its PFAS Products would release PFAS that would dissolve in water; reach water systems and the environment in Puerto Rico; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in Puerto Rico due to their toxicity. Such knowledge was accessible to 3M, but not to the Commonwealth until 3M's acts and omissions came to light and the Commonwealth developed its own understanding of the toxicity of PFAS.

### 2.     Old DuPont Knew, or Should Have Known, of the Harms Caused by PFOA, and It Concealed Its Knowledge from Regulators, the Scientific Community, and the General Public

102.     In the 1950s, Old DuPont began using PFOA and other PFAS in its specialty chemical productions applications, including household products like Teflon, and quickly thereafter developed an understanding of the dangers of using these chemicals.

103.     During this time, Old DuPont was aware that PFOA was toxic to animals and humans and that it bioaccumulates and persists in the environment. Old DuPont also knew that the PFAS present in Teflon and its other specialty chemical products would proliferate and contaminate the environment. Old DuPont was further aware that industrial facilities related to products like Teflon emitted and discharged PFOA and other PFAS in large quantities into the environment and that scores of people had been exposed to its PFAS, including via public and private drinking water supplies.

104.    Old DuPont scientists issued internal warnings about the toxicity associated with its PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

105.    In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing the samples for the presence of fluorine.

106.    By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. Old DuPont did not share these data or the results of its worker health analysis with the general public or government entities, including the Commonwealth, at that time.

107.    The following year, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans accumulate PFOA in their tissues, and that "continued exposure is not tolerable."

108.    Not only did Old DuPont know that PFOA accumulated in humans, it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two-or 25%-had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

109.    Old DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of the study of its own plant workers.

110.    In addition to its knowledge of PFOA's toxicity danger, Old DuPont was also aware that PFAS were capable of contaminating the surrounding environment, leading to human exposure. Old DuPont was aware, no later than 1984, that PFOA is biopersistent.

111.    Old DuPont was long aware that the PFAS it was releasing from its facilities could leach into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near Old DuPont's Washington Works plant in West Virginia, Old DuPont held a 1984 meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA. Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business and that these departments had "no incentive to take any other position."

112.    Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

113.    In 2004, EPA filed an administrative enforcement action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of the federal Toxic Substances Control Act ("TSCA") and Resource Conservation and Recovery Act ("RCRA"). Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and undertake supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

114.    Despite its knowledge regarding PFOA's toxicity, Old DuPont continued to claim that PFOA posed no health risks and, in fact, expanded its manufacture and sale of PFAS Products after 3M announced its phase out of PFOA and PFOS in 2000. In 2008, Old DuPont's literature was quoted in an Industrial Fire World magazine article regarding AFFF as stating that Old DuPont "believes the weight of evidence indicates that PFOA exposure does not pose a health risk to the general public" because "there are no human health effects known to be caused by PFOA."

### 3.    Old DuPont Worked in Concert with Other Defendants and the Firefighting Foam Coalition to Protect AFFF containing PFAS from Scrutiny.

115.    The Firefighting Foam Coalition ("FFFC"), a Virginia-based national AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability. National Foam, Kidde-Fenwal, Tyco/Ansul, Chemguard, Dynax, Old DuPont, and Chemours (collectively, "FFFC Members"), were members of the FFFC, as were others in the industry. Through their involvement in the FFFC and other trade associations and groups, FFFC Members shared knowledge and information regarding PFOA and its precursors released from AFFF among themselves but did not share that information with the general public or governmental entities, including the Commonwealth.

116.    FFFC Members worked together to protect AFFF containing PFAS from scrutiny, including by coordinating their messaging on PFOA's toxicological profile and on the contribution of AFFF containing PFAS for the presence PFOA into the environment. All of this was done as a part of the FFFC's efforts to shield its members and the AFFF industry from the detrimental impact of the public and government entities learning the truth about the harms of PFOA to the environment and human health. FFFC Members regularly published newsletters promoting their AFFF containing PFAS, while also regularly attending trade group conferences to disseminate misleading messaging.

117.    FFFC Members' coordinated messaging and publishing efforts were meant to dispel concerns about the impact AFFF containing PFAS had on the environment and human health. They worked in concert to conceal from the general public and governmental entities, including the Commonwealth, the risks of their AFFF containing PFAS and the PFOA and its precursors contained therein.

118.    FFFC Members repeated the same messaging for years, with the result that only one PFAS chemical-PFOS, which FFFC Members' products did not contain-was taken off the market.

119.    FFFC Members knew, however, that their messaging regarding their AFFF containing PFAS was false. Each of the FFFC Members knew that PFOA was released directly into the environment from the use of their AFFF containing PFAS and that PFOA presented a similar threat to the environment and public health as that posed by PFOS. While FFFC Members knew this, it was not similarly understood by the public and government entities, including the Commonwealth.

**4.    Remaining Defendants Knew, or Should Have Known, of the Harm Caused by the Release of PFOA from their AFFF containing PFAS.**

120.    The remaining Defendants knew, or should have known, that their AFFF containing PFAS would harm the environment and human health when used in their common and/or intended use.

121.    The remaining Defendants knew, or should have known, that their AFFF containing PFAS released and/or discharged PFAS that would dissolve in water; reach water systems and the environment in the Commonwealth; resist degradation; bioaccumulate and biomagnify; and harm ecological, animal, and human health in the Commonwealth.

122.    The Commonwealth, by contrast, did not have access to such information and thus was not made aware of the dangers that the Defendants' AFFF presented.

**C.  Puerto Rico's Affected Natural Resources**

123.    Puerto Rico's Constitution establishes the Commonwealth's right and obligation to protect the health of its citizens and natural resources. *See* P.R. CONST., Art. VI, § 19. Article 6, section 19 provides that "[i]t shall be the public policy of the Commonwealth to conserve, develop and use its natural resources in the most effective manner possible for the general welfare of the community. . . ." *Id.*

124.    "The Commonwealth recognizes that all persons are entitled and should enjoy a healthy environment. . . ." 12 L.P.R.A § 8001(b). Accordingly, the Environmental Public Policy Act (the "Act") codifies the Commonwealth's obligation to provide its citizens with "[t]he most effective protection of the environment and natural resources." *Id.* § 8001(c)(1).

125.    The Act affords present and future generation of Puerto Ricans with the right to a "secure, safe, healthy, productive, and aesthetically and culturally pleasing landscapes[,]" "the fullest enjoyment of the beneficial uses of an environment *free from degradation, health or safety*

*risks or other undesirable consequences*[,]" and "an environment that affords diversity and variety for individual selection for present and future generations alike." *Id.* § 8001a(a)(2)-(4) (emphasis added).

126.   "[I]n full awareness of the profound impact of human activity on the interrelations of all components of the natural environment . . . it is the ongoing policy of the Government of the Commonwealth, including its municipalities, in cooperation with all public and private organizations so interested, to use all practical means and measures . . . with the purpose of encouraging and promoting general wellness and ensuring that all natural systems are healthy and able to sustain life in all its forms . . .   in order to create and maintain conditions under which humankind and nature can coexist in productive harmony. . . ." *Id.* § 8001(a)

127.   The Commonwealth's Legislature has declared that "the waters and bodies of water of Puerto Rico are the property and wealth of the People of Puerto Rico." 12 L.P.R.A § 1115a; *see also* 12 L.P.R.A §§ 521, 603, 613, 633. The waters of Puerto Rico, whether surface or ground waters, must be maintained with "the degree of purity . . . required for the welfare, safety and development of the Island, to insure the water supply that may be needed by the present and future Puerto Rican generations." 12 L.P.R.A. § 1115a. They must be used "in accordance with the public interest and with their best, most beneficial and most reasonable use." *Id.*

128.   Puerto Rico's wetlands are "of great ecological value, unmatched beauty and of a significant recreational, educational, scientific and economic worth." 12 L.P.R.A. § 5001. They "improv[e] the quality of water and the environment, [] replenish[] [] aquifers, or ground waters, provide food and habitats for wildlife, propitiate the establishment of food chains, help to mitigate floods, produce oxygen, retain and stabilize the sediments from the highlands, so that they do not go into the sea, and provide scenic tourist attractions." *Id.*

129.    Another vital natural resource is the Commonwealth's forests. "Forests are a natural and unique resource because of their capacity to preserve and restore the ecological balance of the environmental surroundings; they conserve the soil, water, flora and fauna; they supply timber products; they provide a wholesome environment for outdoor recreation and for the spiritual inspiration and relaxation of man, and forestry provides a rural source of employment. Forests constitute, therefore, an essential heritage, which demands their maintenance, conservation, protection and expansion in order to secure their full benefit and enjoyment for this generation, as well as a legacy for future generation." 12 L.P.R.A. § 192. To preserve its precious forests, the Commonwealth's Legislature forbids throwing, discarding, or dumping "chemical substances that are harmful to the flora, fauna, or soil or subsoil." *See id.* § 198.

130.    Additionally, "it is the public policy of the Commonwealth to protect and preserve the caves, caverns or sinkholes in Puerto Rico." 12 L.P.R.A. § 1143a. These natural resources not only "deserve[] immediate protection to prevent their irreparable damage or destruction" due to their beauty, but also to protect their fauna, and groundwater. *Id.* Contaminating the water in any cave, cavern or sinkhole is prohibited. *Id.* § 1143c.

131.    The Commonwealth also "seeks to protect, preserve and conserve the coral reefs along the territorial waters of Puerto Rico for the benefit and enjoyment of this and future generations." 12 L.P.R.A. § 241.

132.    Protecting all wildlife and their natural habitat is also "declared as the public policy of the Government of Puerto Rico." 12 L.P.R.A. § 107a; *see also* 12 L.P.R.A. § 1227 ("[N]atural communities and habitats that shelter wildlife, as well as those that are essential for the survival and protection of the species of flora and fauna that are vulnerable or in danger of extinction . . . should be preserved for their value as a natural resource."). The Commonwealth's Legislature

forbids "discharging or depositing" any substance "that kills or destroys the fish, crustaceans or mollusks in any lake, lagoon, spring, river, stream, channel or any current of water of Puerto Rico." 12 L.P.R.A. § 25j-1.

133.    The Commonwealth's natural resources, which include its waters, wetlands, groundwater, ocean waters, and estuaries within or subject to its jurisdiction, "are the patrimony and wealth of [its] people." 12 L.P.R.A. § 1212. "The optimal use of [the Commonwealth's] environment, taking into consideration its natural features, is an absolute necessity because of the insular nature of [the] territory, [its] high population density, the susceptibility of many areas to natural events such as floods and tides, and the deep impact of [human] actions. The conservation of forests, wetlands, and any other ecosystems on which [the Commonwealth's] wildlife depends, among other natural resources, is therefore necessary to meet the social and economic needs of present and future generations of Puerto Ricans." 12 L.P.R.A. § 5101.

134.    Accordingly, "[A]ll persons responsible for polluting our soils, waters, and atmosphere shall be accountable for *decontamination- and restoration*-related costs, and when applicable, for compensating the people of Puerto Rico for harm inflicted." 12 L.P.R.A. § 8001(b) (emphasis added).

135.    Natural resources and properties owned by the Commonwealth have been injured by contamination caused by Defendants' PFAS Products.

136.    PFAS attributable to Defendants' PFAS Products have been found in groundwater, surface water, sediments, and soils in the Commonwealth. Furthermore, the Commonwealth anticipates that additional contamination of natural resources from PFAS attributable to Defendants' PFAS Products will be uncovered as its investigation continues.

137.    Contamination from PFAS persists in the Commonwealth's natural resources (i.e., it does not break down in the environment); damages their intrinsic (i.e., existence and passive use) value; and impairs the public benefits derived from access to, use, and enjoyment of the Commonwealth's natural resources.

138.    The current and future residents of the Commonwealth have a substantial interest in having natural resources uncontaminated by PFAS, as do the tourism, recreation, fishing, and other industries that rely upon maintaining a clean environment for their businesses, patrons, and tourists to visit and enjoy.

**1.      Groundwater**

139.    Groundwater is a critical and finite ecological natural resource for the people of the Commonwealth, as the Commonwealth relies on groundwater for drinking, irrigation, and agriculture.

140.    The Commonwealth relies on groundwater for drinking water supplies. Approximately 59 million gallons of groundwater are withdrawn each day for the Commonwealth's citizens.

141.    In addition to serving as a source of water for drinking, agriculture, and other uses, groundwater is an integral part of the overall ecosystem in the Commonwealth. Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of aquatic ecosystems. Groundwater also keeps water in rivers during times of drought.

142.    Groundwater promotes the movement of water and nutrients within and among the Commonwealth's bodies of water and wetlands, prevents saltwater intrusion, provides groundwater stabilization, and helps to maintain critical water levels in freshwater wetlands.

143.     Groundwater and the Commonwealth's other natural resources are unique resources that help sustain the Commonwealth's economy.

144.     Among other PFAS Products, AFFF is a significant source of PFAS contamination in groundwater; AFFF discharges result in the mobilization of PFAS in and through groundwater sources to reach areas beyond the location of the AFFF's use. This contamination adversely affects the groundwater.

145.     Elevated levels of PFAS exist in the groundwater near military facilities where AFFF is believed to have been used. For example, groundwater samples taken at or near the Naval Station Roosevelt Roads/Camp Garcia detected PFOS and PFOA concentrations reaching 491,401 ppt and 351,375, respectively.

146.     Additionally, groundwater samples from Muniz International Airport detected the presence of six PFAS compounds, including PFOS concentrations of 11,000 ppt and PFOA concentrations of 2,300 ppt.

147.     Investigation is required to determine the full scope of PFAS contamination in groundwater in Puerto Rico, so that it may be remediated and restored.

**2.     Surface Water**

148.     Surface water is a critical ecological resource of the Commonwealth, and its citizens rely on it for their freshwater demands. Surface water-which includes all water in the Commonwealth's rivers, lakes, streams, bays, and wetlands-accounts for 89% of the daily total amount of public-supply water withdrawn.

149.     Surface water in the Commonwealth is also used for recreational, industrial, agricultural, and other commercial purposes. Some specific uses include swimming, boating, recreational and commercial fishing, and marine transportation.

150.     Surface water also provides aesthetic and ecological values, including supporting aquatic ecosystems, nearby communities, and the residents of the Commonwealth.

151.     PFAS are mobile and persistent in surface water and can spread great distances from the point of discharge. PFAS contamination in the Commonwealth has reached and adversely affected surface water. For example, surface water samples taken at or near Fort Buchanan showed PFOS and PFOA concentrations of 16 ppt and 5.4 ppt, respectively.  AFFF use at other military sites in the Commonwealth may have similarly impacted nearby surface water.

152.     Investigation is required to determine the full scope of PFAS contamination in groundwater in Puerto Rico, so that it may be remediated and restored.

**3.      Coastal Resources and Estuaries**

153.     Coastal and estuarine areas in Puerto Rico offer a wide array of ecological services to the Commonwealth by providing habitat for diverse species of plants and aquatic species, and protection from storms.

154.     Healthy coastal resources and estuaries also enhance the Commonwealth's economy by increasing tourism, fishing, and other commercial enterprises. For example, approximately 4,300 businesses and 66,720 employees in Puerto Rico are dependent on these resources.

155.     The Commonwealth has approximately 300 miles of shoreline, which contain approximately 3,370 $km^2$ of fringing coral reefs.  Coral reefs are home to approximately 242 fish species, and benefit the Commonwealth by reducing flood damage to the Island.

156.     Estuaries are partially enclosed bodies of water surrounding coastal habitats where saltwater from the ocean mixes with fresh water from rivers and streams within the Commonwealth. Estuaries provide habitat for many kinds of marine life and commercially

important species including striped bass, blue crabs, and oysters. They also benefit Puerto Ricans by increasing economic development and food security for the Commonwealth.

157.    The EPA has designated one of Puerto Rico's estuaries—The San Juan Bay Estuary—as one of 28 estuaries of national significance. The San Juan Bay Estuary provides nursery habitat for many important species, including the leatherback sea turtle and the manatee, which are endangered species.

158.    On information and belief, PFAS have contaminated estuaries and surrounding lands. These coastal habitats and estuaries are some of the most imperiled marine habitats due to the contamination caused by PFAS and they serve as long-term reservoirs of PFAS, where PFAS are stored and released over time, impacting the estuaries and increasing PFAS concentrations in the cells and tissues of the shellfish and other wildlife that people eat.

159.    Investigation is required to determine the full scope of PFAS contamination in groundwater in Puerto Rico, so that it may be remediated and restored.

**4.    Forests, Caves, Caverns, and Sinkholes**

160.    Approximately 59% of the Island is covered by forest land. Forests offer significant ecological services towards the preservation of the environment. For example, they provide wildlife habitat, biological diversity, food production, and are also critical in regulating surface and groundwater flow.

161.    Puerto Rico experiences numerous forest fires every year—approximately between 2,000 to 5,000.

162.    Caves and caverns are natural openings in the earth formed by erosion of rock. The entrances to caves are on the surface while the entrances to caverns are underground. Water passing through caves and caverns reaches the groundwater quicker as it travels through rock and soil.

Thus, contaminated caves and caverns risk the rapid migration of pollutants into the Commonwealth's groundwater.

163.    Sinkholes are depressions in the ground with no surface drainage, and are also caused by erosion. Puerto Rico contains approximately 1,172 areas where sinkholes that are 30 meters deep form. The Commonwealth's sinkholes often serve as tourist attractions thus benefiting the Commonwealth's economy.

164.    However, sinkholes may be thinly lined by soil, thereby allowing accumulated water to flow down into the groundwater. Consequently, if contaminated water reaches a sinkhole, the Commonwealth's drinking water is at even higher risk of being polluted.

165.    Investigation is required to determine the full scope of PFAS contamination in groundwater in Puerto Rico, so that it may be remediated and restored.

**5.    Sediments, Soils, and Submerged Land**

166.    The Commonwealth's sediments, soils, and submerged lands are critical components of its ecological resources. Sediments, soils, and submerged lands sustain a wide diversity of plants and animals that are essential to a healthy ecosystem. They provide a living substrate for submerged and emergent flora, which in turn support diverse invertebrate species, wading birds, and fish and shellfish populations.

167.    PFAS contamination in the Commonwealth has reached and adversely affected soil and sediment. For example, sampling at or near Muniz Army National Guard Base detected PFOS and PFOA in the soil. PFAS have been detected in the soil of at least one other military site in Puerto Rico. The soil at other military sites on the island may also contain PFAS.

168.    Additionally, PFAS in the soil column serve as a continuing source of contamination of groundwater and other resources of the Commonwealth. PFAS in sediments, as well as in surface water, increase PFAS concentrations in fish.

169.    Investigation is required to determine the full scope of PFAS contamination in groundwater in Puerto Rico, so that it may be remediated and restored.

**6.    Biota**

170.    Biota, including the Commonwealth's flora and fauna, are critical ecological resources.

171.    PFAS contamination poses a risk to plants and animals because PFAS can cause damage to the liver and immune system in animals and has been shown to damage cell structure and organelle functions in plants.

172.    Natural resource injuries to biota in the Commonwealth negatively impact not only the individual species directly involved, but also the capacity of the injured ecosystems to regenerate and sustain life into the future.

173.    Moreover, impacts to aquatic animals within the Commonwealth likely due to PFAS Products have been documented.  For example, studies published by the National Institute of Health have documented findings of  PFOS in the plasma of West Indian manatees in Florida and Puerto Rico.

174.    PFAS contamination attributable to Defendants' products has reached and adversely affected biota in the Commonwealth, such as manatees that live in and depend on water bodies contaminated with PFAS.

175.    Investigation is required to determine the full scope of PFAS contamination in groundwater in Puerto Rico, so that it may be remediated and restored.

**D. Defendants PFAS Products Have Contaminated Puerto Rico, Including Its Sources of Drinking Water, and Defendants Are Liable for Costs to Remediate and Restore the Commonwealth's Natural Resources.**

176.    The Commonwealth's natural resources have been contaminated with PFAS attributable to Defendants' products. Significantly, Defendants' manufacturing, marketing, and selling of AFFF in the Commonwealth, including to the U.S. military, have been a substantial factor in causing PFAS contamination and injuries to the natural resources of the Commonwealth. Investigation will be required to determine additional locations in Puerto Rico where there is PFAS contamination, and the products causing this contamination.

177.    Department of Defense investigations have thus far revealed contamination at five military sites: Muniz Air National Guard Base; Camp Santiago Joint Maneuver Training Center; Fort Allen Training Center; Naval Station Roosevelt Roads; and Fort Buchanan.

178.    At the Naval Station Roosevelt Roads, for example, groundwater sampling by the Department of Defense revealed concentrations of 491,401 ppt of PFOS and 351,375 ppt of PFOA in the groundwater.

179.    Additionally, a preliminary assessment and site inspection conducted by the U.S. Army in March 2022 found PFAS to be present in the groundwater, surface water, soil, and sediment at or near Fort Buchanan.

180.    Further investigation will be required to ascertain contamination at sites where AFFF was likely used as well as areas impacted by other sources of PFAS contamination. Such investigation is necessary to determine the full scope of contamination at various sites and areas and to return the affected natural resources to levels that are safe for human health and the environment and to the condition they were in prior to the impact of these contaminants.

181.    Each Defendant has caused PFAS contamination in the Commonwealth through the manufacture, marketing, and sale of PFAS Products.

182.    Each Defendant's PFAS Products are a substantial factor in causing the injury inflicted on the Commonwealth's natural resources.

183.    Defendants are liable for the cost of investigation, remediation, and restoration of all the property, soils, sediments, waters, and other natural resources contaminated with PFAS from their products, as well as for the Commonwealth's loss of past, present, and future uses of such contaminated natural resources.

184.    PFAS contamination in groundwater and surface water is likewise affecting the Commonwealth's drinking water sources. Studies targeted at assessing contaminants in the Commonwealth's drinking water have detected PFAS compounds, including PFOS and PFOA, in tap water in the Commonwealth. In fact, a recent study by the EPA found that PFOA was a top-ranked contaminant present the Commonwealth's tap water.

185.    Additionally, exposure to PFAS from AFFF may cause a range of adverse health effects, including reproductive and developmental conditions. The Commonwealth's high rates of developmental conditions is well documented, and studies have found PFOA, PFOS, PFNA, and PFHxS, in the blood and urine of pregnant women in Puerto Rico.

186.    At a minimum, the PFAS contamination in drinking water will require constant medical and tap water monitoring and testing.

187.    Defendants are liable for all of the costs necessary to investigate and treat (in perpetuity) any and all drinking water wells and sources of drinking water adversely affected by PFAS from their products in the Commonwealth.

**E.  Old DuPont's Multi-Step, Years-Long Fraudulent Scheme to Isolate Its Valuable Tangible Assets from Its PFAS Liabilities and Hinder Creditors**

188.    As EPA, States, and private plaintiffs became aware of the hazards presented by the presence of PFAS in AFFF, Old DuPont, beginning in or about 2013 and continuing through

38

at least June 2019, planned and executed a series of corporate restructurings designed to separate its valuable assets from its billions of dollars of legacy environmental liabilities-especially those arising from PFOA and other PFAS contamination.

189.    Old DuPont's potential cumulative liability related to PFOA and other PFAS, including PFAS-containing AFFF, is likely billions of dollars due to the persistence, mobility, bioaccumulative properties, and toxicity of these "forever" compounds, as well as Old DuPont's decades-long attempt to hide the dangers of PFAS from the public.

190.    For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina, among others. As alleged above, throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and persistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that scores of people had been exposed to PFOA, including through public and private drinking water supplies, like those in the Commonwealth, which Old DuPont had contaminated. Thus, Old DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFAS, including PFAS-containing AFFF.

191.    Beginning, at least, in 1999 and continuing to the present, Old DuPont has faced mounting litigation arising from its historic manufacture, production and use of PFAS. In 1999, members of the Tennant family, who owned property affected by contamination from a landfill that had accepted PFOA wastes from Old DuPont's nearby Washington Works plant, sued Old DuPont in West Virginia federal court.

192.    Old DuPont's in-house counsel were very concerned about Old DuPont's exposure to liability related to PFOA. In November 2000, one of Old DuPont's in-house lawyers handling

PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

193.    In 2005, after settling the Tennant case, Old DuPont settled claims brought by EPA for violations of TSCA and RCRA related to its failure to disclose toxicity and exposure information for PFOA, as discussed in 113.

194.    Also in 2005, a West Virginia court entered a final order approving a 2004 settlement of a class action lawsuit filed against Old DuPont on behalf of 70,000 Ohio and West Virginia residents who had been exposed to PFOA that Old DuPont had discharged from Washington Works.

195.    Under the terms of the settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to confirm which diseases were linked to PFOA exposure, to filter local water from impacted public and private drinking water supplies, and to pay up to $235 million for medical monitoring of the affected community for any diseases that the Science Panel linked to PFOA exposure. The settlement also provided that any class members who developed the diseases linked by the Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that the class members' exposure to PFOA could cause each of the linked diseases.

196.    By 2012, after seven years of studies, the Science Panel confirmed "probable links" between exposure to PFOA and the following serious human diseases: medically diagnosed high

cholesterol, ulcerative colitis, pregnancy induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

197.   After the Science Panel confirmed such probable links with human disease, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by class members with one or more of those linked diseases under the terms of the 2005 class settlement. In 2013, these claims were consolidated in federal multidistrict litigation styled In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation (MDL No. 2433) in the U.S. District Court for the Southern District of Ohio ("Ohio MDL"). Forty bellwether trials were scheduled to take place in 2015 and 2016.

198.   The first three trials in the Ohio MDL ended in plaintiffs' verdicts. Each jury awarded damages in a larger amount than the one before it-the first awarded $1.6 million; the second awarded $5.6 million; and the third awarded $12.5 million. The second and third jury awards included punitive damages. Old DuPont then settled the remaining, pending claims for $670.7 million dollars.

199.   Old DuPont knew or should have known that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination caused by its manufacturing operations at other sites throughout the country, its releases and disposal of PFAS chemicals globally, and for toxic PFAS chemicals in its own products and the myriad of products into which its toxic PFAS were incorporated, and that its liability likely measured in the billions of dollars.

200.   Anticipating this significant liability exposure, Old DuPont convened an internal initiative known as "Project Beta" in or about 2013 for Old DuPont's management to consider restructuring the company in order to, among other things, avoid responsibility for the widespread

environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

201.    In furtherance of possible restructuring opportunities, including potential mergers, Old DuPont and The Dow Chemical Company ("Old Dow") began to discuss a possible "merger of equals" in or about 2013.

202.    However, neither Old Dow nor any other rational merger partner would agree to a transaction that would result in exposing it to the substantial PFAS and environmental liabilities that Old DuPont faced.

203.    Accordingly, Old DuPont's management decided to pursue a multi-year corporate restructuring specifically orchestrated to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in an attempt to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

204.    Old DuPont engaged in a coordinated three-part restructuring plan that consisted of (i) Old DuPont's attempt to cast off its massive environmental liabilities onto Chemours and spinning off Chemours as a separate publicly traded company, (ii) the creation of New DuPont to facilitate a purported merger with Old Dow, and (iii) a series of internal restructurings and divestitures that culminated with the spinoff of Old DuPont to its newly formed parent, Corteva.

205.    The first step in Old DuPont's fraudulent scheme was to transfer its performance chemicals business, which included Teflon and other products ("Performance Chemicals Business"), into its wholly owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

206.    Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not insulate its own assets from its PFAS liabilities as Old DuPont still faced direct liability for its own conduct.

207.    The second step in the scheme involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

208.    In the third step, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures," which culminated in DowDuPont spinning off two new publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow"), which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. (i.e., New DuPont).

209.    Old DuPont's restructuring-beginning with the spinoff of Chemours in 2015, and ending with the spinoff of Corteva on June 1, 2019-was designed to separate Old DuPont's massive historic PFAS liabilities from its valuable, non-PFAS assets and thereby hinder, delay, and defraud creditors.

210.    As a result of this restructuring, between December 2014 (i.e., before the Chemours Spinoff) and December 2019 (i.e., after the Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion, or by approximately one-half.

211.    New DuPont and Corteva now hold a significant portion of the tangible assets that Old DuPont formerly owned.

212.    Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Old DuPont, New DuPont, and Corteva have, likely intentionally, acted to hide from creditors the details about where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

213.    The below graphic depicts the restructuring as it progressed through each of the three steps:



214.    In greater detail, the restructuring scheme was implemented as follows.

**1.    Step 1: The Chemours Spinoff**

215.    In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary.

216.    On April 30, 2015, Chemours was converted from a limited liability company to a corporation named "The Chemours Company."

217.    On July 1, 2015, Old DuPont completed the spinoff of Chemours, and Chemours became a separate, publicly traded entity.

218.    At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, including business units that had manufactured, used, and discharged PFOA into the environment.

219.    Prior to the spinoff, Chemours's Board of Directors was dominated by Old DuPont employees. As a result, during the period of time that the terms of its separation from Old DuPont were being negotiated, Chemours did not have an independent Board of Directors or management independent of Old DuPont.

220.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into a June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

221.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

222.    At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature and value of probable maximum loss and the anticipated timing of the liabilities that Chemours assumed are set forth in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

223.    Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Old DuPont caused Chemours to transfer to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

224.    Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. Old DuPont required Chemours to fund these distributions through financing transactions, including

senior secured term loans and senior unsecured notes totaling approximately $3.995 billion, entered into on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont's shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

225.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, like those of the Commonwealth, and Old DuPont stripped Chemours's value for itself and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours.

226.    In addition to requiring Chemours to assume billions of dollars of Old DuPont's PFAS liabilities, the Chemours Separation Agreement includes an indemnification of Old DuPont in connection with those liabilities, which is uncapped and does not have a survival period.

227.    Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting pollution, including PFOA, into the environment from its dozens of facilities.

228.    Under the Chemours Separation Agreement, Chemours must indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross

negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

229.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

230.    In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

231.    There was no meaningful, arms-length negotiation of the Chemours Separation Agreement and Old DuPont largely dictated its terms.

232.    The Chemours Spinoff was so one-sided that Chemours, in May 2019, sued Old DuPont, New DuPont, and Corteva in Delaware Chancery Court. See The Chemours Company v. DowDuPont, et al., C.A. No. 2019-0351 (Del. Ch. Ct., filed May 13, 2019).

233.    In its Amended Complaint-which was verified by Chemours's current Chief Executive Officer, Mark Newman-Chemours alleged that the primary motivation for the Chemours Spinoff, the subsequent creation of New DuPont, and the final separation of Corteva was to enable Old DuPont to "wash its hands of its environmental liabilities."

234.    Chemours also alleged, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities were properly estimated and (ii) the Delaware court did not limit the liability that the Chemours Separation Agreement imposed on it, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

235.    Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of the commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

236.    Old DuPont's apparent goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products such as PFAS-containing AFFF, and in so doing, shield Old DuPont.

237.    Given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public filings with the U.S. Securities and Exchange Commission ("SEC") that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

238.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

239.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

240.    For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental

remediation. Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

241.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont and Chemours facilities.

242.    For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the personal injury multidistrict litigation brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

243.    Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at that time.

**2.      Step 2: The Old Dow/Old DuPont "Merger"**

244.    After the Chemours Spinoff, Old DuPont took the position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades.

245.    Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, however, and Old DuPont remained liable for the liabilities it had caused and Chemours had assumed.

246.     Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

247.     On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "Dow-DuPont Merger"). The companies disclosed that they intended to separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

248.     To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc. (i.e., New DuPont), and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

249.     Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

250.     Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, likely because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont. DowDuPont was aware of Old DuPont's historical PFAS liabilities.

251.    The corporate organization following the "merger" is depicted under "Step 2" in the graphic depicted in Paragraph 213.

**3.    Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow**

252.    Following the Dow-DuPont Merger, DowDuPont underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

253.    It is apparent that the transactions were intended to further frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.

254.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

255.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont, for far less than the assets were worth.

256.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old

Dow, and which holds the Materials Science Business. DowDuPont retained the Specialty Products Business and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

257.   The below graphic depicts the structure of DowDuPont after the internal reorganization and realignment (and notes the planned disposition of the new companies):



258.   The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

259.   The DowDuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont (Specialty Products Business). New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

260.   Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained. In particular, (i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

261.   Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science, or Specialty Products Businesses, including its PFAS liabilities. These assumed PFAS liabilities are allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement.

262.   This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the Commonwealth's claims in this case.

263.   While New DuPont and Corteva have buried the details in nonpublic schedules, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. The Commonwealth can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of and damage to the Commonwealth's natural resources.

264.   The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend.

265.   DowDuPont then consolidated the Agricultural Business line into Old DuPont and "contributed" Old DuPont to Corteva.

266.    On June 1, 2019, DowDuPont spun off Corteva as an independent public company, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

267.    Corteva now holds 100% of the outstanding common stock of Old DuPont.

268.    The corporate structures of New DuPont, New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted in Step 3 of the graphic in Paragraph 213.

269.    Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (i.e., New DuPont).

270.    On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

**F.    The Effect of the Years-Long Conspiracy to Defraud the Commonwealth and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities.**

271.    The net result of these transactions, including the June 1, 2019 Corteva spinoff, was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

272.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

273.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

274.    For example, for the fiscal year ending 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating

activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

275.    Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (also known as Earnings Before Tax or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

276.    Also, for the fiscal year ending in 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ending in 2019, Old DuPont owned just under $21 billion in tangible assets.

277.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets-totaling $20 billion.

278.    As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were composed of intangible assets, including "goodwill" from its successive restructuring activities.

279.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

280.    In addition, neither New DuPont nor Corteva has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that either entity will be able to satisfy future judgments.

281.    Indeed, New DuPont-to which PFAS liabilities are allocated under the DowDuPont Separation Agreement-has divested numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value and is in the process of divesting more.

282.    Old DuPont's parent holding company, Corteva-to which PFAS liabilities are also allocated under the DowDuPont Separation Agreement once certain conditions are satisfied-holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

283.    The Chemours Spinoff, the Dow-DuPont Merger, and the final separation of Corteva were part of a single coordinated fraudulent scheme to hinder, delay, and defraud Old DuPont's creditors.  The Chemours Spinoff constitutes a fraudulent transfer, which entitles the Commonwealth to, among other things, void the transaction and recover property or value transferred from Chemours in the transaction. The Dow-DuPont Merger and separation of Corteva from New DuPont likewise constitutes a fraudulent transfer that entitles the Commonwealath to, among other things, recover property and value transferred to New DuPont and Corteva.

### CAUSES OF ACTION

#### COUNT I
#### SAFE DRINKING WATER ACT
#### (ALL DEFENDANTS)

284.    The Commonwealth incorporates by reference the preceding paragraphs as though fully set forth herein.

285.    The United States Congress enacted SDWA in 1974 to ensure that public water supply systems meet minimum national standards for the protection of public health. SDWA recognizes that states play an important part in administering and enforcing drinking water standards.

286.    Pursuant to the SDWA, a State has primary enforcement responsibility for public water systems when delegated such authority by the Administrator of EPA.  42 U.S.C. § 300g-2.

287.    The Commonwealth is a "State" for purposes of the SDWA.  42 U.S.C. § 300f(13).

288.    USEPA has delegated authority to the Commonwealth to enforce the SDWA in Puerto Rico. *See Water Programs; Determination of Primary Enforcement Responsibility; Puerto Rico*, 45 Fed. Reg. 6835 (Jan. 30, 1980).

289.    The Safe Drinking Water Act ("SDWA") authorizes the Commonwealth to "take such actions as [it] may deem necessary" in order to protect the health of the Commonwealth's residents if it possesses "information that a contaminant which is present or is likely to enter a public water system or underground source of drinking water … may present an imminent and substantial endangerment to the health of persons." 42 U.S.C. § 300i.

290.    Pursuant to this imminent and substantial endangerment provision of the SDWA, the EPA Administrator can "commenc[e] civil action for appropriate relief including a restraining order or permanent or temporary injunction." *Id*. §§ 300i(a); 300g-2; *see also* 45 Fed. Reg. 6835 (Jan. 30, 1980).

291.    PFAS from Defendants' Products are "contaminant[s]" as defined by the SDWA, which are defined as "any physical, chemical, biological, or radiological substance or matter in water." 42 U.S.C. § 300f(6).

292.    A "person" is defined under the SDWA as "an individual, corporation, company, association, partnership…." *Id.* § 300f(12). Defendants are each a "person" with this meaning.

293.    Defendants have engaged and are engaging in activities that have caused or contributed to PFAS contamination of drinking water and drinking water sources at sites throughout the Commonwealth due to Defendants' PFAS Products. Such contamination presents

an imminent and substantial endangerment to human health within the meaning of 42 U.S.C. § 300i.

294.    Defendants are thus subject to liability under SDWA for appropriate relief.

295.    The Commonwealth, as a delegated State responsible for enforcing the SDWA, may "commenc[e] a civil action" for appropriate relief, including injunctive relief. 42 U.S.C. § 300i(a).

296.    The Commonwealth has been delegated primary authority to enforce the SDWA's imminent and substantial endangerment provision in Puerto Rico.  Because PFAS contamination present in or threatening to enter drinking water supplies in Puerto Rico poses an imminent and substantial endangerment to human health, the Commonwealth institutes this action against Defendants to assess and remedy the PFAS contamination from Defendants' Products affecting and threatening Puerto Rico's drinking water and drinking water supplies pursuant to the SDWA and seeks recovery of reasonable costs of any investigation, inspection, or monitoring that led to the discovery and may lead to the future discovery of the conditions posing such threats, recovery of reasonable costs incurred and to be incurred by Puerto Rico in removing, correcting, or terminating the adverse effects resulting from Defendants' actions, and an order requiring Defendants to remediate to acceptable levels, provide alternative drinking water supplies to residents whose drinking water has been impacted, and/or conduct medical monitoring for Puerto Rico residents who have been exposed to PFAS  contamination in drinking water supplies caused by Defendants' PFAS Products. 42 U.S.C. § 300i.

297.    In addition, the Commonwealth seeks injunctive relief necessary to address actual, and to prevent threatened, injuries to Puerto Rico's drinking water supplies, including any such

injuries and threats that present an imminent and substantial endangerment to the health of Puerto Rico's residents. *Id.*

298.    New DuPont and Corteva assumed Old DuPont's SDWA liabilities.

## COUNT II
### STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN
### (ALL DEFENDANTS)

299.    The Commonwealth incorporates by reference the preceding paragraphs as though fully set forth herein.

300.    At all relevant times, Defendants designed, manufactured, marketed, distributed, sold, and were otherwise engaged in the business of selling PFAS Products.

301.    Defendants caused PFAS Products to be placed in the stream of interstate commerce, and, as a result, these products were marketed, distributed, and sold to users in the Commonwealth.

302.    Defendants had a duty to design, manufacture, distribute, and sell products that were not unreasonably dangerous, such that those products were safe for their intended and reasonably foreseeable uses by ordinary consumers.

303.    Defendants owed this duty to users of their products as well as other persons, including the Commonwealth and its citizens, who might be foreseeably harmed by the use of their products.

304.    Defendants' PFAS Products were used for their intended purpose and in a reasonably foreseeable manner in the Commonwealth.

305.    PFAS released and/or discharged into the environment from Defendants' PFAS Products cause extensive contamination of property and natural resources with persistent, bioaccumulative, and toxic chemicals.

306.    PFAS released and/or discharged into the environment from Defendants' PFAS Products cause contamination of groundwater and surface water that are sources of drinking water, and, as a result, significantly threatens the public health and welfare.

307.    PFAS Products that Defendants designed, manufactured, marketed, and sold were dangerous to an extent beyond which would be contemplated by the ordinary consumer, the general public, and the Commonwealth in the intended and foreseeable use of these products, and these products thus did not meet the ordinary consumer's expectations regarding their safety.

308.    The ordinary consumer did not understand the nature and characteristics of PFOS and PFOA released into the environment as a result of the intended and reasonably foreseeable use of Defendants' PFAS Products due to, among other things, Defendants' concealment regarding the risks of PFOS and PFOA to human health and the environment.

309.    Additionally, the design of Defendants' PFAS Products was not otherwise reasonable, based on the following.

310.    The significant public health and environmental risk and damage associated with Defendants' PFAS Products outweighed the cost to Defendants of reducing or eliminating such risk.

311.    Defendants knew or should have known about reasonably safer designs for their PFAS Products that contained less or no PFAS.

312.    Defendants knew or should have known at the time their PFAS Products were designed that the intended and reasonably foreseeable use of these products would release PFAS into the environment and that the resulting contamination would pose risks to public health, property, and natural resources.

313.   Defendants failed to provide instructions or warnings that disclosed the characteristics and nature of PFAS to users of their PFAS Products or the public, more generally.

314.   Defendants' PFAS Products were defective at the time these products left their control, and those products reached their end user without substantial change in their condition.

315.   As a direct and proximate result of Defendants' unreasonably dangerous design of their PFAS Products, the Commonwealth's natural resources, its property, and the public health have been injured by PFAS contamination.

316.   As a direct and proximate result of Defendants' acts and omissions, the Commonwealth has incurred, is incurring, and will continue to incur damages in an amount to be proved at trial related to PFAS contamination throughout Commonwealth where Defendants' PFAS Products were used.

317.   As a further direct and proximate result of Defendants' acts and omissions, the Commonwealth has incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the Commonwealth's natural resources, its property, and its people where Defendants' PFAS Products were used for which Defendants are strictly liable.

318.   Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

319.   Defendants are strictly liable for all such damages, and the Commonwealth is entitled to recover all such damages and other relief as set forth below.

320.   New DuPont and Corteva assumed Old DuPont's design defect liability described above.

## COUNT III
### STRICT PRODUCTS LIABILITY - FAILURE TO WARN
### (ALL DEFENDANTS)

321.    The Commonwealth incorporates by reference the preceding paragraphs as though fully set forth herein.

322.    At all relevant times, Defendants designed, manufactured, marketed, distributed, sold, and were otherwise engaged in the business of selling PFAS Products.

323.    Defendants caused PFAS Products to be placed in the stream of interstate commerce, and, as a result, these products were marketed, distributed, and sold to users in the Commonwealth.

324.    As designers, manufacturers, marketers, distributors, and sellers of PFAS Products, Defendants had a strict duty to warn against latent dangers resulting from the intended and foreseeable uses of their PFAS Products and that were known or should have been known to Defendants.

325.    Defendants' duty to warn extended to users of their products as well as third parties—including the Commonwealth and its citizens—who might foreseeably be harmed by the intended and foreseeable uses of their PFAS Products.

326.    Defendants knew or reasonably should have known that: the use of their PFAS Products in their intended and foreseeable manner would result in release of PFAS into the environment; when released into the environment, PFAS cause extensive contamination of natural resources and property with persistent, bioaccumulative, and toxic chemicals; PFAS migrate to groundwater and surface water that are sources of drinking water, where they threaten the public's health and welfare; PFAS endanger human health and safety; and PFAS are difficult and costly to remediate from the environment.

327.    At all relevant times, the dangers posed by Defendants' PFAS Products were not contemplated by ordinary consumers, the general public, or the Commonwealth.

328.    Notwithstanding Defendants' superior knowledge of the risks posed by their PFAS Products, Defendants failed to adequately warn users, the public, and the Commonwealth of those risks; they failed to instruct users on safe methods for use and disposal in ways that would have eliminated or reduced the release of PFAS to the environment; and they failed to provide adequate precautions regarding such hazards in the labeling of their PFAS Products.

329.    Any warnings that Defendants may have disseminated were rendered ineffective by their false and misleading statements about the safety of their PFAS Products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

330.    Defendants' inadequate warnings and instructions rendered their PFAS Products not reasonably safe.

331.    Defendants' PFAS Products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those products reached their end user without substantial change in their condition.

332.    Had Defendants provided adequate warnings and instructions, users in the Commonwealth would have used PFAS Products in ways that would have reduced or eliminated the release of PFAS into the environment. In addition, if Defendants adequately warned of the adverse impacts to public health and the environment caused by the intended and foreseeable use of their products the Commonwealth and its citizens would have taken measures to avoid or lessen the impacts in the Commonwealth.

333.    As a direct and proximate result of Defendants' failure to warn, the Commonwealth's natural resources, its property, and the public health has been injured by PFAS contamination.

334.    As a direct and proximate result of Defendants' acts and omissions, the Commonwealth has incurred, is incurring, and will continue to incur damages related to PFAS contamination at sites and areas in the Commonwealth where Defendants' Products were used and disposed.

335.    As a further direct and proximate result of Defendants' acts and omissions, the Commonwealth has incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the Commonwealth's natural resources, its property, and its people where Defendants' PFAS Products were used and disposed for which Defendants are strictly liable.

336.    Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

337.    Defendants are strictly liable for all such damages, and the Commonwealth is entitled to recover all such damages and other relief as set forth below.

338.    New DuPont and Corteva assumed Old DuPont's failure to warn liability described above.

## COUNT IV
### PUBLIC NUISANCE
### (ALL DEFENDANTS)

339.    The Commonwealth incorporates by reference the preceding paragraphs as though fully set forth herein.

340.    Groundwater, surface water, sediments, soils, and biota are natural resources of the Commonwealth held in trust by the Commonwealth for the benefit of the public.

341.    The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

342.    The contamination of the groundwater, surface water, sediment, soils, and biota at and around the various sites throughout Puerto Rico where Defendants' PFAS Products were used and disposed constitutes a physical invasion of the Commonwealth's natural resources and, on information and belief, the Commonwealth's real property at or in the vicinity of these sites and an unreasonable and substantial interference, both actual and potential, with (i) the exercise of the public's common right to these natural resources; (ii) the Commonwealth's special property and statutory status and obligations regarding the natural resources of the Commonwealth; (iii) the Commonwealth's ability to protect, conserve, and manage the natural resources of the Commonwealth, which are by law precious and invaluable public resources held by the Commonwealth in trust for the benefit of the public; and (iv) the rights of the people of the Commonwealth to enjoy their natural resources free from interference by pollution and contamination.

343.    As long as the natural resources at and around these various sites throughout Puerto Rico remain contaminated by PFAS from Defendants' products, which are present due to Defendants' conduct, the public nuisance continues.

344.    Until these natural resources are restored to their pre-injury quality, Defendants are liable for the creation and continued presence of a public nuisance in contravention of the public's common right to clean natural resources.

345.    The release and/or discharge of PFAS from Defendants' products into, and their continued presence in drinking water constitutes a public nuisance because such releases and/or discharges create an ongoing condition injurious to health so as to interfere with the comfortable enjoyment of life or property.

346.    The release and/or discharge of PFAS from Defendants' products into, and its continued presence in, drinking water and the Commonwealth's natural resources further creates an ongoing nuisance that impacts the well-being of neighborhoods and of large numbers of the citizens of Puerto Rico.

347.    Defendants marketed PFAS Products to their customers knowing that the use and disposal of their products—used exactly as marketed and intended—would create a public nuisance. Likewise, well after Defendants understood the mobile, persistent, bioaccumulative, and toxic nature of PFAS in the environment, Defendants never instructed their customers to stop applying or using the PFAS Products in their possession or that they needed to specially dispose of PFAS Products so as to not further contaminate the natural resources of the Commonwealth.

348.    Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

349.    New DuPont and Corteva assumed Old DuPont's nuisance liability described above.

## COUNT V
### TRESPASS
### (ALL DEFENDANTS)

350.    The Commonwealth incorporates by reference the preceding paragraphs as though fully set forth herein.

351.    The Commonwealth is the owner and/or actual possessor of property rights and interests in the natural resources of the Commonwealth, including its waters, which the Commonwealth also holds in trust for the benefit of the public.

352.    Defendants' intentional and/or negligent conduct caused PFAS released and/or discharged from their products, to enter, invade, intrude upon, injure, trespass, and threaten to trespass upon the Commonwealth's possessory interest in properties it owns, including but not limited to the Puerto Rico's lands, parks, wildlife, and waters, for which Defendants are liable.

353.    PFAS released and/or discharged from Defendants' products continue to be located on or in the Commonwealth's property.

354.    Defendants intended to manufacture products with PFAS, and knew with substantial certainty that their acts would invade and contaminate the Commonwealth's property.

355.    Defendants are therefore liable for trespass and continued trespass.

356.    Defendants did not and do not have authority, privilege, or permission to trespass upon the aforesaid possessory property interests.

357.    The Commonwealth has never consented to the trespasses alleged herein, and does not currently consent to Defendants' continued trespass.

358.    Defendants have refused and failed to terminate their trespasses, despite being put on notice to do so by the Commonwealth through its policies, statutes, regulations, orders, and other means.

359.    Defendants' trespass is of a continuing nature and has produced a long-lasting negative effect upon the property of the Commonwealth, as Defendants knew or had reason to know at all times relevant hereto.

360.    Based on their conduct, Defendants have, at all times relevant to this action, created, caused, maintained, continued, substantially contributed to, substantially participated in, and/or assisted in the creation of such trespass. Based on their knowledge of the properties and manner of distribution, sale, and use of PFAS Products, as alleged herein, Defendants were or should have been aware that as a result of their conduct, contamination of the Commonwealth's property with PFAS was inevitable or substantially certain to result.

361.    As a direct and proximate cause of Defendants' conduct, the Commonwealth has suffered and continues to suffer damages from Defendants' conduct and the presence of PFAS, in the Commonwealth's property, including without limitation costs to assess, investigate, monitor, analyze and remediate contamination, costs to prevent PFAS Products from injuring additional property of the Commonwealth, and costs to restore and replace the Commonwealth's impacted natural resources whose use and value have been lost or degraded.

362.    As a direct and proximate result of Defendants' acts and omissions, the Commonwealth has incurred and suffered, and will continue to incur and suffer, substantial costs and damages for which Defendants are liable.

363.    New DuPont and Corteva assumed Old DuPont's trespass liability described above.

## COUNT VI
### NEGLIGENCE
### (ALL DEFENDANTS)

364.    The Commonwealth incorporates by reference the preceding paragraphs as though fully set forth herein.

365.    As designers, manufacturers, marketers, distributors, and sellers of PFAS Products, Defendants owed a duty of care to persons who might be foreseeably harmed from the use of their products, including the Commonwealth and its citizens.

366.    Defendants further had a duty not to contaminate the Commonwealth's natural resources and endanger the health of its citizens.

367.    Defendants knew or should have known that: the use of their PFAS Products would result in release of PFAS into the environment; when released into the environment, PFAS cause extensive contamination of natural resources and property with persistent, bioaccumulative, and toxic chemicals; PFAS migrate to groundwater and surface water that are sources of drinking water, where they threaten the public's health and welfare; PFAS endanger human health and safety; and PFAS are difficult and costly to remediate from the environment.

368.    Defendants breached their duties to the Commonwealth by, among other things: marketing and otherwise promoting their PFAS Products while concealing the threat of PFAS contamination; failing to provide warnings or instructions to eliminate or reduce the release of PFAS from their products; failing to inform regulators, the general public, the Commonwealth, and its citizens about the nature, characteristics, and human health and environmental risks of PFAS.

369.    As a direct and proximate result of Defendants' negligence, the Commonwealth's natural resources, its property, and the public health have been injured by PFAS. As a direct and proximate result of Defendants' acts and omissions, the Commonwealth has incurred, is incurring, and will continue to incur damages related PFAS contamination throughout the Commonwealth where Defendants' PFAS Products were used and disposed.

370.    As a further direct and proximate result of Defendants' acts and omissions, the Commonwealth has incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the

Commonwealth's natural resources, its property, and its people where Defendants' PFAS Products were used and disposed for which Defendants are liable.

371.    Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably would be harmed by those acts or omissions.

372.    New DuPont and Corteva assumed Old DuPont's negligence liability described above.

### COUNT VII
### PUERTO RICO ENVIRONMENTAL PUBLIC POLICY ACT
### (ALL DEFENDANTS)

373.    The Commonwealth incorporates by reference the preceding paragraphs as though fully set forth herein.

374.    The Defendants are each "person[s]" as defined by 24 L.P.R.A. § 591(d).

375.    The activities and omissions of Defendants alleged herein have resulted in the "pollution" of "waters" of the Commonwealth as defined by 24 L.P.R.A. § 591(i),(e).

376.    The Defendants actions caused PFAS to be discharged into the waters of the Commonwealth. PFAS are "other" types of pollution as that term is defined by 24 L.P.R.A § 591(h).

377.    The Defendants' activities, individually and collectively, have directly or indirectly, caused the discharge of PFAS into the waters of the Commonwealth. The pollution has caused the waters to be outside the minimum standards of purity set forth in the Commonwealth's regulations promulgated pursuant to 24 L.P.R.A. § 599 in violation of 24 L.P.R.A. § 595 and 12 L.P.R.A. § 8002c(b)(7)(B)

378.    Each Defendant directly or indirectly, caused the discharge or permitted the discharge of PFAS into the waters of the Commonwealth and/or onto the land where PFAS have seeped or will ultimately seep into the waters of the Commonwealth, polluting said waters.

379.    Violations of 24 L.P.R.A. § 595 and the regulations promulgated under 24 L.P.R.A. § 599 constitute violations of The Environmental Public Policy Act, 12 L.P.R.A. §8001 *et seq.* *See* 12 L.P.R.A. § 8002d(2).   The Commonwealth has standing to enforce the provisions of the Environmental Public Policy Act.

380.    The Defendants' unlawful actions causing discharge of PFAS into the waters of the Commonwealth caused damages to the environment and natural resources of the Commonwealth including but not limited to the ground waters, including Class SG ground waters, and surface waters, which are subject to very stringent criteria pursuant to the Puerto Rico Water Quality Standards set forth in DNER regulations .

381.    Pursuant to Section 1.17 of DRNA's regulation, it is unlawful to alter the natural properties of a body of water in a way that causes damage or is injurious to human health or to wildlife, flora, or fauna. *See* DRNA Reg. § 6213. It is also unlawful to interfere with the enjoyment of life or property, or otherwise violate any applicable environmental regulations, by adversely altering the physical, chemical microbiological or radioactive properties of water. *Id.* The presence of PFAS in the water causes damage to human health, animals, and plants, and interferes with the enjoyment of life and property by altering the properties of water. Accordingly, Defendants continuously violate this requirement so long as PFAS remains in the waters of the Commonwealth.

## COUNT VIII
## ACT TO PROTECT THE PURITY OF DRINKING WATER OF PUERTO RICO
## (ALL DEFENDANTS)

382.    The Commonwealth incorporates by reference the preceding paragraphs as though fully set forth herein.

383.    Puerto Rico also enacted its own version of the SDWA, known as the Act to Protect the Purity of Drinking Water of Puerto Rico in 1977.

384.    The PFOS and PFOA contamination from AFFF containing PFAS that is present or may enter public water systems in Puerto Rico caused by Defendants presents and certainly may present an imminent and substantial endangerment to the health of persons in Puerto Rico.

385.    The Commonwealth seeks recovery of reasonable costs of any investigation, inspection, or monitoring that led to the discovery and may lead to the future discovery of the conditions posing such threats, recovery of reasonable costs incurred and to be incurred by Puerto Rico in removing, correcting, or terminating the adverse effects resulting from Defendants' actions, and an order requiring Defendants to remediate to acceptable levels, provide alternative drinking water supplies to residents whose drinking water has been impacted, and/or conduct medical monitoring for Puerto Rico residents who have been exposed to PFOS and/or PFOA contamination in drinking water supplies caused by AFFF containing PFAS.

386.    In addition, the Commonwealth seeks injunctive relief necessary to address actual, and to prevent threatened, injuries to Puerto Rico's drinking water supplies, including any such injuries and threats that present an imminent and substantial endangerment to the health of Puerto Rico's residents.

387.    New DuPont and Corteva assumed Old DuPont's liabilities under the Puerto Rico Act.

COUNT IX
RESTITUTION FOR UNJUST ENRICHMENT
(ALL DEFENDANTS)

388.     The Commonwealth incorporates by reference the preceding paragraphs as though fully set forth herein.

389.     The Commonwealth asserts a claim for restitution against all Defendants to recover the Defendants' profits gained or avoided costs saved through their wrongful acts as described below.

390.     These funds are sought in order to restore the environment and natural resources impacted by Defendants' PFAS Products.

391.     Each Defendant has, at all times relevant to this action, allowed PFAS to enter or threaten to enter the natural resources of the Commonwealth.

392.     Defendants marketed, sold, and distributed their PFAS Products to the Commonwealth and other users in the Commonwealth for profit.

393.     Defendants knew of the dangers that their PFAS Products posed to the Commonwealth's air, soil, sediment, biota, surface water, estuaries, submerged lands, wetlands, groundwater, drinking water, other natural resources, and property held in trust or otherwise owned by the Commonwealth, as well as the public's health and safety.

394.     Defendants knew or should have known about reasonably safer and feasible alternatives to their PFAS Products, but chose to maximize profit instead of adopting those alternatives.

395.     The Commonwealth has conferred a benefit upon Defendants by incurring costs of the contamination from Defendants' PFAS Products, while Defendants have not borne those costs, thereby increasing their profits.

396.     It is unjust for Manufacturing Defendants to retain the benefits gained from forcing the Commonwealth to incur costs associated with the contamination from their PFAS Products, instead of bearing that cost themselves.

397.     As described above, Corteva and New DuPont assumed Old DuPont's unjust enrichment liability.

**COUNT X**
**RESCISSION OF FRAUDULENT TRANSFER IN RELATION TO CHEMOURS SPINOFF**
**(OLD DUPONT, CHEMOURS, NEW DUPONT, AND CORTEVA ONLY)**

398.     The Commonwealth incorporates by reference the preceding paragraphs as though fully set forth herein.

399.     Under Puerto Rico Civil Law, transactions that are executed in fraud of creditors can be rescinded.

400.     Under Puerto Rico Civil Law, the following transactions are presumed to be executed in fraud of creditors: transactions that exclude an asset from the debtors' assets; transactions that cause or aggravate the debtor's insolvency; transactions that are executed with the intention of impairing the action of creditors; or transactions in which the debtor alienates property for inadequate consideration. *See* Puerto Rico Civil Code of 2020, Articles 298 *et seq.*, 31 L.P.R.A. § 6242, *et seq.* (previously Puerto Rico Civil Code of 1930, Articles 1243-1249, 31 L.P.R.A. § 3491, *et seq.*).

401.     The Commonwealth is and was a creditor of Chemours at all relevant times.

402.     Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Chemours Assumed Liabilities").

403.    Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities for the benefit of Old DuPont.

404.    Old DuPont and Chemours acted with the intent to hinder, delay, and defraud creditors or future creditors such as the Commonwealth.

405.    Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

406.    At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Chemours intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

407.    Chemours did not receive a fair or reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Chemours Assumed Liabilities.

408.    Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business and debt obligations.

409.    At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

410.    The Commonwealth and its citizens have been harmed as a result of the Chemours Transfers.

411.    Pursuant to the Puerto Rico Civil Law, the Commonwealth seeks to rescind the Chemours Transfers and to recover property or value transferred to Old DuPont.

412.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

## COUNT XI
### RESCISSION OF FRAUDULENT TRANSFERS IN RELATION TO DOW-DUPONT MERGER AND SUBSEQUENT REORGANIZATIONS, DIVESTITURES, AND SEPARATION OF CORTEVA
### (OLD DUPONT, NEW DUPONT, AND CORTEVA ONLY)

413.     The Commonwealth incorporates by reference the preceding paragraphs as though fully set forth herein.

414.     Under Puerto Rico Civil Law, transactions that are executed in fraud of creditors can be rescinded.

415.     Under Puerto Rico Civil Law, the following transactions are presumed to be executed in fraud of creditors: transactions that exclude an asset from the debtors' assets; transactions that cause or aggravate the debtor's insolvency; transactions that are executed with the intention of impairing the action of creditors; or transactions in which the debtor alienates property for inadequate consideration. *See* Puerto Rico Civil Code of 2020, Articles 298 *et seq.*, 31 L.P.R.A. § 6242, *et seq.* (previously Puerto Rico Civil Code of 1930, Articles 1243-1249, 31 L.P.R.A. § 3491, *et seq.*).

416.     The Commonwealth is and was a creditor of Old DuPont at all relevant times.

417.     Old DuPont knew that the Chemours Spinoff alone would not isolate its valuable assets and business lines from the Chemours Assumed Liabilities. Thus, the Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities. Through the Dow-DuPont Merger and the subsequent reorganizations, divestitures, and separation of Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

418.     The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

419.     Old DuPont, New DuPont, and Corteva acted with intent to hinder, delay and defraud creditors or future creditors such as the Commonwealth.

420.    Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

421.    At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

422.    Old DuPont did not receive a fair or reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

423.    Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business and debt obligations.

424.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

425.    The Commonwealth and its citizens have been harmed as a result of the Old DuPont Transfers.

426.    Pursuant to Puerto Rico Civil Law, the Commonwealth seeks to rescind the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

427.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

## COUNT XII
### ACTUAL FRAUDULENT TRANSFER IN RELATION TO CHEMOURS SPINOFF
### (OLD DUPONT, CHEMOURS, NEW DUPONT, AND CORTEVA ONLY)

428.    The Commonwealth realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

429.    Under DEL. CODE title 6, § 1304(a)(1), a transaction made by a debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor" is voidable as to the creditor's claim.

430.     Under DEL. CODE title 6, §§ 1301(3) and (4), a "creditor" is "a person who has a claim" and a "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

431.     The Commonwealth is and was a creditor of Chemours at all relevant times.

432.     As detailed above, see ¶¶ 204-205, the Chemours Transfers and Assumed Liabilities were made for the benefit of Old DuPont.

433.     At the time that the Chemours Transfers were made and the Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

434.     Old DuPont and Chemours acted with the intent to hinder, delay, and defraud creditors or future creditors such as the Commonwealth.

435.     The Commonwealth has been harmed as a result of the Chemours Transfers.

436.     Old DuPont and Chemours engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Commonwealth that have been damaged as a result of the actions described in this Complaint.

437.     Under DEL. CODE, title 6 §§ 1301 to 1312, the Commonwealth is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

438.     The Commonwealth also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and seeks a constructive trust over such property or value for the benefit of the Commonwealth.

439.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

## COUNT XIII
### CONSTRUCTIVE FRAUDULENT TRANSFER IN RELATION TO CHEMOURS SPINOFF
### (OLD DUPONT, CHEMOURS, NEW DUPONT, AND CORTEVA ONLY)

440.    The Commonwealth realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

441.    Under DEL. CODE title 6, §§ 1304(a)(2), 1305(a), a transaction made by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or obligation" is voidable if "the debtor: (i) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; (ii) [i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due"; or (iii) "was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation."

442.    Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Assumed Liabilities.

443.    At the time that the Chemours Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

444.    Chemours made the Chemours Transfers and assumed the Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business and debt obligations.

445.    Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Assumed Liabilities.

446.     At the time that the Chemours Transfers were made and Chemours assumed the Assumed Liabilities, Old DuPont and Chemours intended Chemours to incur or believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

447.     The Commonwealth has been harmed as a result of the Chemours Transfers.

448.     Under DEL. CODE tit. 6, §§ 1301 to 1312, the Commonwealth is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

449.     The Commonwealth also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and seeks a constructive trust over such property or value for the benefit of the Commonwealth.

450.     Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

### COUNT XIV
### ACTUAL FRAUDULENT TRANSFER IN RELATION TO DOW-DUPONT MERGER AND SUBSEQUENT REORGANIZATIONS, DIVESTITURES, AND SEPARATION OF CORTEVA
### (OLD DUPONT, NEW DUPONT, AND CORTEVA ONLY)

451.     The Commonwealth realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

452.     The Commonwealth is and was a creditor of Old DuPont at all relevant times.

453.     Old DuPont knew that the Chemours Spinoff alone would not isolate its valuable assets and business lines from the Chemours Assumed Liabilities. Thus, the Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities. Through the Dow-DuPont Merger and the subsequent reorganizations, divestitures, and separation of Corteva, Old DuPont engaged in the Old DuPont Transfers.

454.     The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

455.     At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

456.     Old DuPont, New DuPont, and Corteva acted with the intent to hinder, delay and defraud creditors or future creditors such as the State.

457.     The Commonwealth has been harmed as a result of the Old DuPont Transfers.

458.     Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Commonwealth that has been damaged as a result of the actions described in this Complaint.

459.     Under DEL. CODE tit. 6, §§ 1301 to 1312, the Commonwealth is entitled to void the Old DuPont Transfers and to recover property and value transferred to New DuPont and Corteva.

460.     The Commonwealth also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and impose a constructive trust over such proceeds for the benefit of the Commonwealth.

**COUNT XV**
**CONSTRUCTIVE FRAUDULENT TRANSFER IN RELATION TO DOW-DUPONT MERGER AND SUBSEQUENT REORGANIZATIONS, DIVESTITURES, AND SEPARATION OF CORTEVA (OLD DUPONT, NEW DUPONT, AND CORTEVA ONLY)**

461.     The Commonwealth realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

462.     Old DuPont knew that the Chemours Spinoff alone would not isolate its valuable assets and business lines from the Chemours Assumed Liabilities. Thus, the Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities.

Through the Dow-DuPont Merger and the subsequent reorganizations, divestitures, and separation of Corteva, Old DuPont engaged in the Old DuPont Transfers.

463.    Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

464.    Each of the Old DuPont Transfers was made to benefit or for the benefit of New DuPont and/or Corteva.

465.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

466.    Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business and debt obligations.

467.    Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

468.    At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

469.    The Commonwealth has been harmed as a result of the Old DuPont Transfers.

470.    Under DEL. CODE tit. 6, §§ 1301 to 1312, the Commonwealth is entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

471.    The Commonwealth also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and impose a constructive trust over such proceeds for the benefit of the Commonwealth.

## COUNT XVI
### DECLARATORY JUDGMENT – 28 U.S.C. § 2201
### (ALL DEFENDANTS)

472.    The Commonwealth realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

473.    The Commonwealth has incurred and will continue to incur costs associated with the release and/or discharge of PFAS from Defendants' products into, and their continued presence in, the Commonwealth's drinking water and natural resources.

474.    The evolving federal regulatory landscape with respect to PFAS contamination means that the full extent of necessary cleanup is not yet ascertainable.

475.    Most recently, the USEPA has indicated its intent to set maximum contaminant levels for PFOS and PFOA, and has provided notice of its intent regulate the combination of PFNA, PFHxS, PFBS, and GenX.

476.    Additionally, the USEPA has announced it will regulate PFAS under multiple federal environmental statutes, including the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq*, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq*. Among other things, USEPA issued a proposed rule that would designate PFOS and PFOA as "hazardous substances" under CERCLA, and has taken steps to strengthen the ability to clean up PFAS contamination through the RCRA corrective action process.

477.    The evolving federal regulation of PFAS contamination will likely set stringent cleanup requirements to protect the human health and environment of Puerto Rico.

478.    Several federal environmental statutes place the liability for the present and future response and cleanup of contamination squarely on those parties responsible for the contamination—including but not limited to RCRA and CERCLA.

479.    As such, Defendants' extensive and ongoing PFAS contamination of the Commonwealth's drinking water sources and natural resources, along with the evolving federal regulatory landscape and subject matter of this suit, create a substantial controversy between the Commonwealth and the Defendants with respect to Defendants' liability for present and future cleanup costs under all applicable federal environmental statutes.

480.    Moreover, it is imperative to cleanup PFAS contamination in Puerto Rico to protect the health of the Commonwealth's citizens and the integrity of its natural resources. Determination of liability for future costs under federal environmental statutes is thereby of sufficient immediacy and reality to justify the issuance of a declaratory judgment.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commonwealth requests that this Court enter judgment against Defendants as follows:

a.    Finding Defendants liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination at sites throughout Puerto Rico where Defendants' PFAS Products were used, discharged, and/or disposed so the contaminated and threatened natural resources and drinking water supplies are restored to their original condition;

b.    Finding Defendants liable for all damages to compensate the People of Puerto Rico for the lost use and value of its natural resources, including ground water and drinking water supplies during all times of injury caused by PFAS Products and

for such orders as may be necessary to provide full relief to address risks to the Commonwealth, including, but not limited to, the costs of:

      i.      Past and future testing of natural resources, including drinking water supplies throughout Puerto Rico where Defendants' PFAS Products were transported, stored, used, handled, released, spilled, discharged and/or disposed and thus, likely caused PFAS contamination;

      ii.      Past and future treatment and remediation of all natural resources, including drinking water supplies at sites throughout Puerto Rico where Defendants' PFAS Products were used, discharged, and/or disposed and which contain detectable levels of PFAS until restored to non-detectable levels; and

      iii.      Past and future monitoring of the Commonwealth's natural resources, including drinking water supplies at sites throughout Puerto Rico where Defendants' PFAS Products were used, discharged, and/or disposed as long as there is a detectable presence of PFAS, and restoration of such natural resources and drinking water supplies to their pre-discharge condition;

      c.      Ordering Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFAS contamination and threatened contamination of the Commonwealth's natural resources, including drinking water supplies at sites throughout Puerto Rico where Defendants' PFAS Products were used, discharged, and/or disposed, including any and all such costs awarded through any revolving fund, loan, and/or grant of any kind regardless of the source of such funding;

d.      Ordering Defendants to pay all damages to the Commonwealth in an amount at least equal to the full cost of restoring the Commonwealth's natural resources, including drinking water supplies to their original condition prior to the PFAS contamination attributable to Defendants' PFAS Products;

e.      Ordering Defendants to pay all compensatory damages for economic damages and for the lost value (including lost use) of the Commonwealth's natural resources, including drinking water supplies as a result of the PFAS contamination attributable to Defendants' PFAS Products;

f.      Ordering Defendants to pay all other damages sustained by the Commonwealth in its public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of Defendants' acts and omissions alleged herein;

g.      Entering an order against Defendants to abate the PFAS contamination caused by their PFAS Products at sites throughout Puerto Rico where Defendants' PFAS Products were used, discharged, and/or disposed by investigating, cleaning up, restoring, treating, monitoring and otherwise responding to contamination of the Commonwealth's natural resources and drinking water supplies at sites throughout Puerto Rico where Defendants' PFAS Products were used, discharged, and/or disposed so that such natural resources and drinking water supplies are restored to their original condition;

h.      Voiding and/or rescinding the Old DuPont Transfers to the extent necessary to satisfy the Commonwealth's claims;

i.      Voiding and/or rescinding the Chemours Transfers to the extent necessary to satisfy the Commonwealth's claims;

j.      Awarding the Commonwealth an additional amount in punitive equal to no less than the actual damages determined by the trier of fact.

k.      Awarding the Commonwealth costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

l.      Entering a declaratory judgment of liability in favor of the Commonwealth and against Defendants for future cleanup costs under all applicable federal environmental statutes, including but not limited to the Resource Conservation and Recovery Act, and the Comprehensive Environmental Response, Compensation, and Liability Act.

m.      Awarding the Commonwealth such other relief as this Court deems appropriate.

The Commonwealth demands trial by jury of all issues so triable.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 31st day of May 2023

**LAW OFFICES OF JOHN K. DEMA, P.C.**

_s/ John K. Dema_
John K. Dema, Esq. (*Pro Hac Vice*)

1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Phone: (340) 773-6142
Email: jdema@demalaw.com

**KELLEY DRYE & WARREN LLP**

_/s William J. Jackson_
William J. Jackson, Esq. (*Pro Hac Vice*)

_s/John D.S. Gilmour_
John D.S. Gilmour, Esq. (*Pro Hac Vice*)

515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Phone: (713) 355-5000
Email: BJackson@KelleyDrye.com
Email: jgilmour@kelleydrye.com

**ORLANDO H. MARTINEZ LAW OFFICES**

_/s Orlando H. Martinez Echeverria_
Orlando H. Martinez Echeverria
USDCPR 213052

**Orlando H. Martinez Echeverria Law Offices**
Centro de Seguros, Suite 413
701 Ponce de Leon Avenue
San Juan, Puerto Rico  00907
Email: omartinez@martinezlaw.org